**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

LILLIAN FERRERI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

McCORMICK & COMPANY, INCORPORATED,

Defendant.

Civil Action No. 15-cv-6760

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Lillian Ferreri ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against defendant McCormick & Company, Incorporated ("McCormick" or "Defendant").

## NATURE OF THE ACTION

1. Defendant manufactures, markets, and distributes spices throughout the world, and sells its products to consumers under the well-known "McCormick" brand through a wide range of retailers, including grocery stores, mass merchandisers, warehouse clubs, discount stores, and drug stores, and online.

2. There are more than 250 other brands of spices, herbs and seasonings sold in the United States. McCormick boasts that "[i]n this competitive environment, [it is] leading with innovation and brand marketing." In fact, McCormick dominates the market with sales of its black pepper. According to market research, the company holds a 43 percent share of the domestic black pepper market, and store brand pepper, which McCormick also produces for major food retailers, has a 30 percent share of the domestic black pepper market.

3. Indeed, McCormick has been in the spice business for over 125 years and has developed iconic brands and packaging with long-standing consumer recognition. McCormick markets and sells its McCormick Pure Ground Black Pepper in tins of various sizes that are recognizable to generations of consumers. McCormick also markets and sells its popular Black Peppercorn Grinder in bottles made with a built-in grinder on the top. McCormick has noted that its consumer business has historically made up approximately 60 percent of its sales and 80 percent of its operating income.

4. However, McCormick has taken advantage of consumers' trust in its products and packaging. McCormick has deceived Plaintiff and other consumers in New York and across the nation by misleadingly and substantially underfilling its black pepper product containers. Specifically, beginning in approximately January or February of 2015, in order to raise the price of these black pepper products without consumers realizing the price increase, McCormick reduced the fill in its ground black pepper tins by 25 percent, and reduced the fill in its black peppercorn grinders by 19 percent.

5. Thus, McCormick has continued to sell its black pepper in the same product packaging it has used for years, but which now contains between 19-25 percent non-functional slack-fill. For example, McCormick's small Black Peppercorn Grinder, which used to hold 1.24 ounces of black peppercorn, now holds just 1 ounce of black peppercorn. The empty space in Defendant's packaging is not visible to consumers and gives consumers the misleading impression that they are purchasing more product than they are actually receiving.

6. This action seeks redress on a class-wide basis for Defendant's deceptive business practices in selling substantially underfilled black peppercorn grinders and pure ground black pepper tins (the "Products"). Each of the Products has non-functional slack-fill packaging in

violation of the Federal Food Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 343(d), 21 C.F.R. § 100.100, and New York General Business Law §§ 349 and 350. In addition, Plaintiff brings claims for unjust enrichment. With respect to each of the Products, the size of the container misleads reasonable consumers into believing they are buying more black pepper than is actually being sold.

**PARTIES**

7. Plaintiff is a citizen of the state of New York, residing in Orange County, New York. Plaintiff was a regular purchaser of McCormick's small Black Peppercorn Grinder. In or around approximately April or May, 2015, Plaintiff purchased McCormick's small Black Peppercorn Grinder containing 1 ounce of black peppercorn from a ShopRite grocery store located in Vails Gate, New York, for approximately $2.50. On past occasions, Plaintiff had purchased the same size McCormick Black Peppercorn Grinder, which contained 1.24 ounces of black peppercorn. Plaintiff was not aware when she purchased the 1 ounce McCormick Black Peppercorn Grinder that it contained approximately 19 percent less pepper than it had in the past. Similarly, Plaintiff was not aware at the time of her purchase of the 1 ounce McCormick Black Peppercorn Grinder that it contained a substantial amount of non-functional slack-fill. Plaintiff believed the McCormick Black Peppercorn Grinder was filled to capacity, as it had been in the past. Plaintiff did not notice the net weight stated in small print on the label of the Product and instead reasonably relied on the size of the Product in making her purchase. She paid an increased cost for the Product, which was worth less than represented because the Product did not contain as much black pepper as the packaging suggested. Had Plaintiff known the Product was not filled to capacity, but instead contained a significant amount of empty space or non-

functional slack-fill, Plaintiff would not have purchased the grinder or would have paid less for the grinder.

8. McCormick is a Maryland corporation with its headquarters and principal place of business in Sparks, Maryland. McCormick manufactures, markets, and distributes the Products through various retailers under the "McCormick" brand.

**JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

10. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within New York, such that Defendant has significant, continuous, and pervasive contacts with the State of New York.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial district, including Plaintiff's purchase of the Product.

**FACTUAL BACKGROUND**

12. Defendant manufactures, markets, distributes, and sells ground black pepper and black peppercorn under the well-known "McCormick" brand. Thousands of retailers, including grocery stores, mass merchandisers, warehouse clubs, discount stores, and drug stores, sell the Products in stores and online.

13. McCormick owns a 22 percent share of the $10 billion global packaged spice and herb category—4 times that of the next largest competitor. In particular, McCormick holds over 40 percent of the domestic black pepper market.

14. McCormick has been in the spice business for over 125 years and its iconic packaging is recognizable to generations of consumers.

15. McCormick has taken advantage of consumers' trust in its products and packaging. Beginning in approximately January or February of 2015, McCormick reduced the fill in its ground black pepper tins by approximately 25 percent, and reduced the fill in its black peppercorn grinders by approximately 19 percent. Thus, these Products are approximately 19-25 percent empty at the time of sale.

16. This empty space is not visible to consumers at the time of purchase.

**McCormick Pure Ground Black Pepper**

17. McCormick sells its Pure Ground Black Pepper in small, medium, and large sized non-transparent metal tins. Historically, these tins contained 2 ounces, 4 ounces, and 8 ounces of ground black pepper, respectively.

18. As of January or February 2015, McCormick reduced the fill in its ground black pepper tins by 25 percent. Specifically, the small, medium, and large sized tins now contain just 1.5 ounces, 3 ounces, and 6 ounces of ground black pepper, respectively.

19. The tins themselves have not changed in size to reflect the reduced fill. Rather, the tins, which have remained the same size at all relevant times, each contain approximately 25 percent of empty space which constitutes non-functional slack-fill.

20. Nor has the price of the Products been reduced to reflect the reduced fill. Instead, McCormick reduced the fill in its Products in a scheme to raise the price of the Products without consumers realizing the price increase.

21. For example, in June of 2015 at a Gristedes grocery store located in New York, New York, the traditionally sized medium tin of McCormick's Pure Ground Black Pepper containing just 3 ounces of pepper was being offered for sale at $7.49, the price of the old 4 ounce tin.




22. Although the tins note in small print the net weight of black pepper contained in the tins, consumers reasonably rely on the traditional size of the tins as the basis of their purchasing decision. Consumers believe the tins are effectively full of pepper as they have been in the past and are not otherwise informed that the Products are substantially underfilled.

23. Moreover, and adding to the consumer confusion and deception, the Products are offered for sale on grocery store shelves next to competing products that are sold in similarly sized tins that are full of black pepper and do not contain non-functional slack fill.

24. For example, at a Key Foods grocery store located in Brooklyn, New York, a 3 ounce slack-filled tin of McCormick's Pure Ground Black Pepper was sold next to a virtually identically sized 4 ounce tin of Gel Spice Company's Pure Ground Black Pepper.




25. The McCormick tin was priced at $4.79, while the Gel Spice tin was priced at $3.99. The misleading size of the McCormick tin leads consumers to believe they are paying just 20 percent more to buy McCormick's tin, when in fact the pepper in McCormick's tin costs $1.60 per ounce and the pepper in the Gel Spice tin costs $1.00 per ounce. Thus, consumers are in fact paying 60 percent more to buy McCormick's tin.

**McCormick Black Peppercorn Grinders**

26. McCormick sells black peppercorn in small and large sized grinders. Although the bottle attached to these grinders is made of glass, the entire top half of the contents of the bottle is covered by a non-transparent label which wraps around the entire circumference of the bottle. Historically, the small and large sized grinders contained 1.24 ounces and 3.1 ounces of black peppercorn, respectively.

27. As of January or February 2015, McCormick reduced the fill in its black peppercorn grinders by approximately 19 percent. Specifically, the small and large sized grinders now contain just 1 ounce and 2.5 ounces of black peppercorn, respectively.

28. The grinders themselves have not changed in size to reflect the reduced fill. Rather, the grinders, which have remained the same size at all relevant times, each contain approximately 19 percent of empty space which constitutes non-functional slack-fill.

29. Although the grinders note in small print the net weight of black peppercorn contained in the grinder, consumers reasonably rely on the size of the grinder as the basis of their purchasing decision. Consumers believe the grinders are effectively full of pepper as they have been in the past and are not otherwise informed that the Products are substantially underfilled.

30. Below, to the left, is an image of a 1 ounce McCormick Black Peppercorn Grinder with the outer label covering the non-functional slack-fill, and to the right is an image of the same 1 ounce McCormick Black Peppercorn Grinder with the outer label removed to reveal the nonfunctional slack-fill.







31. The price of the Products has not been reduced to reflect the reduced fill. Instead, McCormick reduced the fill in its Products in a scheme to raise the price of the Products without consumers realizing the price increase.

32. The reduced fill does not serve a lawful purpose. In fact, the grinder states that it is "Disposable" and advises, "Do Not Refill."

33. In or around approximately April or May, 2015, Plaintiff purchased a small McCormick Black Peppercorn Grinder containing just 1 ounce of black peppercorn. This was the same sized peppercorn grinder that Plaintiff had purchased on past occasions, but which historically had contained 1.24 ounces of black peppercorn. Because of the non-transparent label which wrapped around the top portion of the grinder, Plaintiff did not see the substantial amount

of empty space contained in the grinder. Rather, she believed the container was filled to capacity and relied on the size of the container, which was designed to hold substantially more peppercorn, in making her purchase. When Plaintiff purchased the Product she paid approximately as much as she had in the past, when the grinder contained 1.24 ounces of black peppercorn.

34. The 1 ounce McCormick Black Peppercorn Grinder sells at ShopRite for between $2.50 and $2.99.

35. Had Plaintiff known the Product was not filled to capacity, but instead contained a significant amount of empty space, Plaintiff would not have purchased the grinder or would not have paid as much for the grinder.

**Non-Functional Slack-Fill**

36. McCormick has deceived Plaintiff and other consumers in New York and across the nation by misleadingly and substantially underfilling its black pepper product containers.

37. McCormick has continued to sell its black pepper in the same product packaging it has used for years, but which now contains between 19-25 percent non-functional slack-fill.

38. McCormick lacks any lawful justification for doing so.

39. The FDCA prohibits non-functional slack-fill. *See* 21 U.S.C. § 343(d) (providing a food is deemed misbranded if "its container is so made, formed, or filled as to be misleading"). Federal regulations provide:

> In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.
>
> (a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

> (1) Protection of the contents of the package;
>
> (2) The requirements of the machines used for enclosing the contents in such package;
>
> (3) Unavoidable product settling during shipping and handling;
>
> (4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;
>
> (5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or
>
> (6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other nonmandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

21 C.F.R. § 100.100.

40. The reduced fill does not serve a lawful purpose. McCormick filled the very same size tins and grinders to capacity for years, demonstrating that its slack-fill does not serve a lawful purpose.

41. The empty space or slack-fill in Defendant's packaging is not visible to consumers at the time of purchase and gives consumers the misleading impression that they are purchasing more product than they are actually receiving.

42. Rather than simply charging more for full containers, or shrinking the size of the containers to reflect the reduced fill, McCormick underfills the same sized containers it has used for years. In this way, McCormick misleads consumers into thinking they are purchasing more pepper than they in fact are receiving.

43. Although McCormick does state the net weight of the product in small print toward the bottom of the product packaging, this statement does not correct the misleading impression that the slack filled packaging creates—that consumers are receiving more pepper than they actually are, and as much pepper as they received in the past.

44. Plaintiff, the Class, and the New York Subclass (as defined below) have been damaged by Defendant's deceptive and unfair conduct in that they purchased the Products with non-functional slack-fill and paid more than they otherwise would have paid had Defendant not misrepresented the amount of pepper contained in each of the Products by its use of non-functional slack-fill.

**CLASS ACTION ALLEGATIONS**

45. Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class"). Excluded from the Class are persons who purchased the Products for purposes of resale.

46. Plaintiff also seeks to represent a subclass defined as all members of the Class who purchased the Products in New York (the "New York Subclass").

47. Members of the Class and the New York Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and the New York Subclass number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third party retailers and vendors.

48. Common questions of law and fact exist as to all members of the Class and the New York Subclass and predominate over questions affecting only individual Class and New

York Subclass members. Common legal and factual questions include, but are not limited to, whether Defendant's slack-filled packaging of the Products was misleading.

49. The claims of the named Plaintiff are typical of the claims of the Class and the New York Subclass in that the named Plaintiff was exposed to Defendant's misleading slack-filled packaging, purchased a Product, and suffered a loss as a result of that purchase.

50. Plaintiff is an adequate representative of the Class and the New York Subclass because her interests do not conflict with the interests of the Class or New York Subclass members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class and New York Subclass members will be fairly and adequately protected by Plaintiff and her counsel.

51. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class and New York Subclass members. Each individual member of the Class and New York Subclass may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**(Deceptive Acts or Practices, New York Gen. Bus. Law § 349)**

52. Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

53. Plaintiff brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

54. By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by utilizing non-functional slack-fill in the Products' packaging.

55. The foregoing deceptive acts and practices were directed at consumers.

56. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics, quantities, and benefits of the Products to induce consumers to purchase the Products.

57. Plaintiff and members of the New York Subclass were injured because they paid more for the Products than they would have paid had they known the truth about the Products.

58. On behalf of herself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT II**
**(False Advertising, New York Gen. Bus. Law § 350)**

59. Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

60. Plaintiff brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

61. Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

62. Defendant's misleading and deceptive misrepresentations of fact, including the use of non-functional slack-fill in the Products' packaging, were and are directed at consumers.

63. Defendant's misleading and deceptive misrepresentations of fact, including the use of non-functional slack-fill in the Products' packaging, were likely to mislead a reasonable consumer acting reasonably under the circumstances.

64. Defendant's misleading and deceptive misrepresentations of fact, including the use of non-functional slack-fill in the Products' packaging, have resulted in consumer injury and/or harm the public interest.

65. As a result of Defendant's misleading and deceptive misrepresentations of fact, including the use of non-functional slack-fill in the Products' packaging, Plaintiff has suffered and continues to suffer economic injury.

66. Plaintiff and New York Subclass members suffered an ascertainable loss caused by Defendant's use of non-functional slack-fill in the Products' packaging because they paid more for the Products than they would have paid had they known the truth about the Products.

67. On behalf of herself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT III**
**(Unjust Enrichment)**

68. Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

69. Plaintiff brings this claim individually and on behalf of the members of the Class and the New York Subclass against Defendant.

70. Plaintiff and members of the Class and New York Subclass conferred benefits on Defendant by purchasing the Products.

71. Defendant has been unjustly enriched in retaining revenues derived from Plaintiff's and Class and New York Subclass members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant's illegal utilization of non-functional slack-fill packaging caused Plaintiff and Class and New York Subclass members to purchase and/or pay more for the Products, which they would not have done had the true facts been known.

72. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Class and New York Subclass is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class and New York Subclass for their unjust enrichment, as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant, as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and New York Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and New York Subclass;

B. For an order declaring that Defendant's conduct violates the statutes referenced herein;

C. For an order finding in favor of Plaintiff and the Class and New York Subclass on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E. For prejudgment interest on all amounts awarded;

F. For an order of restitution and all other forms of equitable monetary relief;

G. For an order enjoining Defendant from continuing the unlawful practices detailed herein; and

H. For an order awarding Plaintiff and the Class and New York Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: August 26, 2015

Respectfully submitted,

**LEVI & KORSINSKY LLP**

By: *s/ Andrea Clisura*
Andrea Clisura (AC-1313)

Shannon L. Hopkins (SH-1887)
Shane Rowley (SR-0740)
Nancy Kulesa (NK-2015)
Andrea Clisura (AC-1313)
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (866) 367-6510
Email: shopkins@zlk.com
srowley@zlk.com
nkulesa@zlk.com
aclisura@zlk.com

*Attorneys for Plaintiff*